## Taylor v. Commonwealth.

(Decided Sept. 30, 1938.)

OPINION OF THE COURT BY JUDGE PERRY—Affirming.

The appellant, James Taylor, and Lee Valentine were jointly indicted by the grand jury of Bell county, charging them with the wilfull murder of John Raymond Fuson.

Upon the sperate trial of the appellant, he was by the verdict of the jury found guilty and his punishment fixed at eight years' imprisonment.

. A new trial having been denied him and a judgment entered upon that verdict, he has appealed, seeking its reversal.

The appellant, James Taylor, was at the time of his admitted shooting and killing of the deceased, John Fuson, a peace officer of Bell County, Kentucky, he having served as a deputy sheriff therein for a period of some three years next before this difficulty occurred.

Taylor at this time lived on Straight Creek, near the railway station of Arjay, while the deceased, Fuson, was a farmer who lived some miles distant, on Clear Creek, in Bell County. It appears that each of them, prior to this unfortunate homicide, had never seen, known or heard of the other.

The homicide of which the appellant has here been convicted occurred along the railroad track near Arjay at about four o'clock on the Sunday afternoon of June 20, 1937.

The facts and circumstances leading up to its occurrence are disclosed by the record to be that the deceased, Fuson, had earlier in the afternoon, when accompanied by two friends, driven over to a ball game being played on Straight Creek, where it appears some drinking was indulged in by them. Upon leaving the game, they drove over to Arjay. Upon their arrival, Fuson, then seeming, as stated, much under the influence of drink, got out of the car (over the protest of his two companions) and began to make a display before a number of people, who were then gathered before and were sitting around the railroad station, of a knife and a large pistol he carried and also "punched cars and railroad ties" with a pistol.

Upon Fuson's refusal to get back into the car with his friends, they drove away, leaving him at Arjay, where there is testimony that he proceeded to go over to the railroad track near the station, where a number of people were sitting, and continued to flourish his pistol among them and punch the cross ties and act as a drunken man until there falling in with a man named Pratt, they walked away together down the railroad in the direction of the deceased's home and also of the home of one Mont Redmond, against whom it is stated the deceased had just before manifested a somewhat inflamed mind and vengeful feeling and had stated he was looking for him, because of his having lately had a difficulty with and "beat up" a kinsman of his.

At this time it further appears that some of this

crowd, before which the deceased had given this drunken and disorderly exhibition, suggested that a peace officer should be informed of the deceased's misconduct and threats and requested to arrest him, when Jim Garland, according to the averments of the affidavit filed by the defendant for a continuance, went to the nearby home of the appellant and informed him that a man was then over at Arjay and violating the law, in that he "was drunk and punching people around with a pistol and threatening to kill Mont Redmond who lived in the immediate neighborhood."

The appellant, upon being thus informed, deputized the co-defendant Lee Valentine, who was at the time visiting him, when they at once proceeded to go to Arjay to find and arrest the man who they had been informed was "violating the law" there.

Upon arriving at Arjay, the appellant inquired as to the whereabouts of the man who had been reported as drunken and disorderly, when Fuson was pointed out to him, about a hundred yards down the track, where he sat talking with Clifford Pratt.

The appellant and Valentine at once started walking down the track after him and had come to within some forty yards of him when he, on seeing them, got up and began to walk down the track, away from the approaching officers.

The testimony given by the witnesses for the commonwealth from this point on is in sharp conflict with that given by the appellant and his witnesses. That introduced for the commonwealth is to the effect that the deceased at no time after his arrival at Arjay, either while talking to the people gathered near the track or after going down the track with Pratt, or at the later time of the officers following and arresting him, was guilty of any violation of the law either in being drunk or disorderly, or in carrying a concealed deadly weapon.

Several of these commonwealth witnesses state that they were eyewitnesses to what occurred after the arrival of the appellant peace officer at Arjay, when looking for the deceased; that no offense of any character was at such time committed by the deceased; that they saw him as he sat upon the railroad track talking with Pratt and also as he got up and walked away as the officers approached him, and that neither his walk nor his

behavior was in any way unusual; that he was not drunk, boisterous nor did he commit any offense. That the officers, on the other hand, came down the railroad track after the deceased almost in a run, the appellant carrying a pistol in his hand; that when within a few feet of the deceased, he rushed and grabbed him, jerked him around and shot and killed him.

The testimony as given by the appellant and his witnesses is to the effect that upon his coming from his home over to Arjay in response to the information given him, that the law was being violated there by some man, the deceased was pointed out to him as the law violator, as he sat with Pratt on the track some hundred yards distant; that he and his deputies, Valentine and Rice, proceeded to go down there, walking at their usual and customary gait; that after they started down the track, the deceased saw them coming, got up and walked about forty yards when they overtook him, when he stepped off the track; that the deceased had his hand in his pocket on a forty-five automatic; that he turned and faced appellant, when appellant said, "Consider yourself under arrest. What are you doing with that gun on Sunday?", to which he answered, "No g. d. man can't take my gun."

Further he testified that when he called to the decedent to consider himself under arrest, he "seed a forty-five in his pocket, about half way pulled out of his right pocket." As to his further actions, he testifies as follows: "I made a grab at his pistol and he come out with it when I told him that and I knocked the pistol right straight up with one hand and he jabbed it against me again and I knocked it down again and I had my pistol in my pocket, and he came back with it on me again and I shot him." Further he states that when he shot, the deceased was trying to shoot him and that he shot to save his life. He denied that upon overtaking the deceased he grabbed his arm or hand in which he had his pistol, but stated that he only "knocked the pistol off" to keep deceased from shooting him. Also he denied that he had his own pistol out as he walked down the track to apprehend the deceased.

Further, appellant denied that he had had his hand on his pistol or made any attempt to get it out of his pocket until deceased tried to shoot him.

Upon his cross-examination, appellant stated that he saw the deceased stagger when he was about seventy to a hundred yards away from him, but when asked what he was arresting him for, answered, "because the fellow came over and asked me to make the arrest," and for the offense of "having a gun on him and drunkenness," though upon his direct examination he had stated that he arrested the decedent "for having that pistol there on Sunday." When asked if the pistol was concealed, appellant answered that he saw deceased's pistol when he first walked up and that it was about half out of his pocket and, further, in answer to the question asked upon cross-examination, "Didn't you as an officer know that you didn't have any right to arrest him for a concealed weapon, without a warrant, if that pistol was out where you could see it?", he said, "I thought when I went down there and ordered the man under arrest and him drinking and disturbing people that I had a right to arrest him." Appellant, when asked if he had seen the deceased drinking or disturbing anybody, answered, "No, sir." When asked what deceased had done in the way of violating the law in his presence, he answered, "I didn't think a man had a right to come out on Sunday and run around with a pistol in his pocket, without he was an officer, and I thought I had the right to arrest him. Q. Regardless of what you thought, you were arresting him on information, weren't you, and that's the reason you tried to arrest him? A. I arrested him because I got information from the citizens over there that he was cutting up."

Appellant's witness, Lee Valentine, deputized to assist him in making the arrest and with appellant on this occasion when he overtook and shot the deceased, gives an account somewhat different from that given by appellant as to what took place at the time of the arrest.

"Q. Tell the jury what took place from the time you and Taylor came down to where Fuson was until the shooting was over? A. We walked up to him and Taylor commanded him under arrest and he said, 'No damned man can't arrest me' and started with his pistol and Taylor reached and grabbed him and they went into a clinch.

"Q. Was anything said when he said no

damned man could arrest him? A. When he started with his pistol I said not to do that.

"Q. Whom did you tell that? A. Fuson.

"Q. What else, if anything, did you see that took place there between them after he grabbed and then the shot fired? A. He made about two or three tries to get his pistol out and the last I seen before the shot fired he had his hand up in the air with a pistol in his hand and Taylor was knocking his hand up that way, and the pistol fired.

"Q. Repeat that, please. A. When Taylor grabbed his hand, he made two or three tries before he got his pistol out and finally he got it out and Taylor kept knocking the pistol up before the shot was fired."

Upon the submission of this case to the jury upon the issues made by this very conflicting evidence and with very comprehensive instructions applicable thereto, the defendant was by the jury found guilty of voluntary manslaughter and sentenced to eight years' imprisonment.

This appeal challenges the propriety of that verdict and sentence thereon, and seeks its reversal upon the following grounds: (1) That the court committed errors very prejudicial to the rights of the appellant in its rulings, holding incompetent the testimony offered by the appellant to show the full extent of the information received by him, and under which he claimed he was acting at the time of the homicide, and that the court further erred in permitting the cross-examination of the appellant as to the legal ground upon which he claimed the right to arrest the deceased; (2) that the instructions given were each and all erroneous, particularly the "officer instruction" (No. 4) as given, upon the ground that it deprived appellant of the right to arrest the deceased if he had reasonable grounds to believe and did believe that the deceased had committed an offense in his presence, and further erroneously permitted the deceased to pass upon the right of the appellant to arrest him, and unless deceased was guilty, denied appellant the right to make the arrest or to require deceased to submit to arrest; and (3) that the special counsel for the commonwealth was guilty of misconduct during his closing argument.

Turning now to the consideration and disposition of these objections in the order urged, the appellant first insists that the court committed a highly prejudicial and reversible error in refusing to permit him to testify as to the full details of the information given him at his home by his informant, Garland (who did not appear as a witness upon the trial), as to all the particular actions and forms of misconduct which he reported the deceased had been committing over at Arjay, and because of which he had come to appellant's home and requested that he at once go to Arjay and there apprehend and arrest this man.

The colorful account given the appellant at his home, in reporting to him the various misdoings of the deceased, was however given by the informant when not under oath, nor was any warrant sworn out or issued to the appellant, authorizing him to arrest the deceased for the misdemeanor offenses reported as having been previously committed by the deceased at Arjay.

By way of appraising the merit of appellant's contention, that he was prejudiced in his substantial rights by the court's refusal to allow him to give a full and detailed account of his informant's conversation had with him when reporting the misconduct of the deceased, Fuson, it may be noted that the appellant was, when testifying in his own behalf, asked to tell the court and jury "what information you had as to whether there was anybody over at Glyndon or Arjay that was doing anything," to which he answered, "I got the information there was a man over there cutting up and digging cars around with pistols and flourishing a pistol around among the citizens," to which counsel for plaintiff objected. The court thereupon ruled as follows: "He can tell whether he got information that some one was violating the law, but cannot go into detail."

We are clearly of the opinion that the appellant could not have been prejudiced by this ruling of the court, in having answered, as stated, the questions asked him and in being permitted, as ruled by the court, to tell that he got the information that someone was violating the law, as showing his reason for going over to Arjay. Clearly he got before the jury the fact that he, as a peace officer, had gone over to Arjay in response to this information given him and that the moving cause of his being there was to investigate the reported situa-

tion. It therefore follows that appellant's contention that he was injured by such ruling, we must conclude, is without merit.

Appellant's next objection relates to the six instructions given by the court, each of which appellant criticises and objects to as being erroneous, but particularly the "officer instruction" (No. 4) as given.

While appellant's objection made to each of the instructions requires us to consider and pass upon them, their number and length make it impractical to copy them all in the opinion, nor do we deem it needful to do so, inasmuch as a careful consideration of five of these instructions, namely: (1) the murder instruction, (2) the manslaughter instruction, (3) the lesser degree instruction, (5) the self-defense instruction, (5a) an instruction defining the technical words and phrases used in the instructions, and (6) the reasonable doubt instruction, leads us to conclude that the same as given were correctly given.

However, instruction No. 4, giving what may be termed the "officer instruction," is the main object of appellant's criticism that the instructions were improper and calls for a more particular consideration and discussion of the merits of such contention.

This instruction is as follows:

"The court instructs the jury that the defendant, James Taylor, was a deputy sheriff of Bell county at the time he shot and killed John Raymond Fuson, and as such deputy sheriff had the right, and it was his duty, to arrest any person publicly drunk in his presence, or guilty of concealing or unconcealing a pistol or deadly weapon in his presence, without a warrant.

"If you believe from the evidence that the deceased, John Raymond Fuson, was publicly drunk in the presence of the defendant, or was guilty of concealing or unconcealing a pistol, a deadly weapon, in the presence of the defendant, then it was the duty of the defendant to arrest the deceased. It was the duty of the defendant, James Taylor, as deputy sheriff in making the arrest, if any, *to notify the deceased of his intention to arrest him and of the offense with which he was*

*charged, if he had reasonable opportunity to do so.* And it was the duty of the deceased, if he was guilty of either of the aforesaid offenses, to peaceably submit to the arrest; and if he resisted the arrest, then the defendant had the right to use such force as was reasonably necessary to overcome said resistance, if any, even to the extent of taking the life of the deceased, but the defendant did not have the right to kill the deceased unless he resisted the arrest." (Italics ours.)

Appellant insists that this instruction, by its last clause (beginning "And it was the duty of the deceased, if he was guilty of either of the aforesaid offenses, to peaceably submit to arrest, etc.), deprived appellant of the right to arrest the deceased if he had reasonable grounds to believe, or did believe, that the deceased had committed an offense in his presence and permitted the deceased to pass upon the right of the appellant to arrest him and, unless deceased was guilty, denied appellant the right to make the arrest or to require the deceased to submit to arrest.

We do not take such view of the meaning of this instruction when considered as a whole or that the last clause, when interpreted by its preceding context, reasonably warrants such an interpretation.

While perhaps the criticised clause of the instruction could well have been more aptly and clearly expressed, we are not of the opinion that its natural meaning is to be taken as effecting the results charged against it in appellant's criticism as above set out.

By the first part of the instruction, the jury was told in substance that the defendant, James Taylor, was a deputy sheriff of Bell county at the time he shot and killed the deceased, Fuson, and as such had the right and it was his duty to arrest any person publicly drunk in his presence or guilty of concealing or unconcealing a pistol or other deadly weapon in his presence without a warrant, and further, that if it believed from the evidence that the deceased, John Raymond Fuson, "was publicly drunk (that is, was guilty of being drunk) in the presence of the defendant," etc., then it was the duty of the defendant to arrest the deceased, following which, the criticised clause in question directs that "it was the duty of the deceased, if he was guilty of either

of the aforesaid offense, to peaceably submit to arrest; and if he resisted the arrest, then the defendant had the right to use such force as was reasonably necessary to overcome said resistance,'' etc.

Considering these clauses of the given instruction together, that if the jury believed from the evidence that ''the deceased was publicly drunk in the presence of the defendant, or was guilty of concealing * * * a pistol, a deadly weapon, in the presence of the defendant,'' then it was the duty of the defendant to arrest the deceased and further by implication repeated the same condition, that if the jury believed from the evidence also that Fuson was guilty of either of the named public offenses, of being drunk or concealing a deadly weapon in the presence of the defendant, it was the duty of the deceased to peaceably submit to arrest.

In other words, the instruction, when so considered as a whole, in substance means that if the jury should believe from the evidence that the deceased, John Fuson, was publicly drunk in the presence of the defendant or guilty of concealing a deadly weapon, that in such event, repeating the aforesaid condition, if the jury believed from the evidence that the deceased was guilty of either of the aforesaid offenses, it was his duty to peaceably submit to his arrest.

Having such view of the meaning and correct interpretation of the instruction, the criticised clause of it, ''if he was guilty of either of the aforesaid offenses,'' did not have the effect of submitting as an additional instruction that, only if the deceased felt himself guilty of the offense for which he was being arrested, he should peaceably submit to his arrest, but rather, that if the jury should believe from the evidence that the deceased was publicly drunk or concealing a deadly weapon in the presence of the defendant officer, then it was the duty of the defendant to arrest the deceased and of the deceased to peaceably submit to the arrest.

Such has long been the rule of this jurisdiction, both as declared by its common law and by section 36, Criminal Code of Practice, providing that:

''A peace officer may make an arrest * * * without a warrant, when a public offense is committed in his presence, or when he has reasonable grounds for

believing that the person arrested has committed a felony.''

As each offense named in the instruction was a misdemeanor and not a felony, the instruction given authorized the appellant's arrest of the deceased only if the jury believed from the evidence that the deceased was guilty of doing either of the offenses in the presence of the officer, and not if he (the officer) merely had reasonable grounds for so believing. See Hughes v. Commonwealth, 41 S. W. 294, 19 Ky. Law Rep. 497; Stevens v. Commonwealth, 124 Ky. 32, 98 S. W. 284, 30 Ky. Law Rep. 290; Hatfield v. Commonwealth, 248 Ky. 573, 59 S. W. (2d) 540.

Having concluded that the instruction was not erroneous, but was addressed to the conflicting evidence introduced by the witnesses of the commonwealth and of the appellant respectively, the question became one of fact, to be determined by the jury, of whether or not the deceased, Fuson, was at the time of his arrest by the appellant guilty of committing either of the misdemeanor offenses named in the presence of the appellant. If he was, the appellant as a peace officer had the right to arrest him, and if he resisted the arrest, appellant had the right to use such force as was required to effect the arrest, even to the extent of shooting and killing him. On the other hand, if the jury believed that he was not guilty of committing either of the offenses covered by the instruction in the presence of the officer, the appellant was not, when unarmed with a warrant calling for his arrest, authorized to attempt to take him into custody or arrest him, and his action in so doing, when not protected by an officer's status in exercising a right and discharging a duty as such in arresting the deceased, was a wrongful assault upon him, as found by the jury, and the defendant's shooting and killing of the deceased under such conditions authorized the jury, under the evidence, to find defendant guilty of manslaughter as charged.

As to the further and final objection, that the judgment should be reversed because of the misconduct of the special counsel for the commonwealth in misquoting the evidence of the defendant's witness, Valentine, we are not inclined to concur in that view, as we do not feel it could have been substantially prejudicial to the defendant, in that the counsel, in the matter of errone-

ously stating that the witness, Valentine, had testified differently in part from what he had testified, could have made the misstatement without intention, but rather from a confused or faulty memory as to just what the witness, Valentine, had stated and under such circumstances the court's ruling upon the objection made to the statement, that "the jury will remember the evidence and will try the case by what they heard on the witness stand and the instructions," was calculated to well avert any hurt or injury to the defendant arising therefrom.

Further misconduct on the part of the attorney is charged in the course of his argument before the jury, when he said: "As far as this defendant being a peace officer is concerned, the jury knows that many peace officers are brought into this court house on charges of murder," at which point he was stopped by the objection of the defendant to the argument, when the court ruled upon the objection that, "I think I should sustain that as to the other peace officers." We are of the opinion that this manner of the court's sustaining the objection to the expression, "the jury knows that many peace officers are brought into this court house on charges of murder," was sufficient to avoid any injury resulting to the defendant from the argument.

It is our conclusion, after a careful consideration of the whole case, that the substantial rights of the defendant have not been prejudiced and that he has had a fair trial. Therefore, the judgment is affirmed.